William Boyd Dutton suffered a work-related injury to his right shoulder on February 17, 1987, while an employee of the Saginaw Division of General Motors Corporation (Saginaw). On October 3, 1989, shortly after returning to work at Saginaw following the second of two surgeries performed on his right shoulder, Dutton suffered a work-related injury to his left shoulder. As a result of these incidents, Dutton filed a complaint in the Limestone County Circuit Court on May 18, 1990, seeking worker's compensation benefits.
On January 13, 1993, following ore tenus proceedings, the trial court entered a judgment which held that Dutton had suffered a 60% loss of ability to earn and ordered that Dutton receive benefits for 179.5 weeks, which was 300 weeks less 120.5 weeks paid for temporary total disability, at a rate of $146.40 per week.
Dutton appeals, and Saginaw cross appeals. Both parties question whether the trial court correctly applied the provisions of the Alabama Workmen's Compensation Act, Ala. Code 1975, §§ 25-5-1 to -231 (Repl. 1986) (Act), in determining Dutton's compensation. Specifically, Dutton argues that he should have been awarded benefits for two separate injuries and that the trial court miscalculated the weekly benefits. In its cross appeal, Saginaw raises three additional issues: (1) whether the trial court erred in permitting Dutton to introduce portions of his vocational expert's deposition containing opinion testimony regarding Dutton's vocational impairment before he reached maximum medical improvement; (2) whether the trial court erred in allowing into evidence both the opinion testimony and the written report of Dutton's vocational expert, even though the opinion *Page 599 
and the report were based in part on sources which had not been admitted into evidence; and (3) whether the trial court erred in allowing Dutton to introduce portions of his vocational expert's deposition testimony regarding the results of a computer program, used for calculating Dutton's vocational impairment rating, which was not testified to as authoritative, trustworthy, and reliable.
 DUTTON'S ISSUES
The record reflects that the trial court apparently failed to take § 25-5-57(a)(4)h. into account when calculating the number of weeks of Dutton's compensation. Although this provision appears under the subtitle "Permanent Total Disability," it applies equally to situations involving permanent partial disability. Chrysler Motor Corp. v. Cole, 563 So.2d 1040
(Ala.Civ.App. 1990). Section 25-5-57(a)(4)h. states, in pertinent part:
 "If an employee receives a permanent injury as specified in this section, after having sustained another permanent injury in the same employment, he shall be entitled to compensation for both injuries, subject to the provisions of paragraph e of this subdivision, but the total compensation shall be paid by extending the period and not by increasing the amount of weekly compensation, and in no case for permanent partial disability exceeding 700 weeks."
In this case, although the trial court made no specific finding to this effect, the evidence overwhelmingly reflects that Dutton suffered two separate successive injuries, one to each shoulder, while acting in the line and scope of his employment at Saginaw. Consequently, Dutton was entitled to consecutive 300 week awards for each injury, not to exceed 700 weeks. § 25-5-57(a)(4)h.
We next consider whether the trial court correctly determined the weekly amount of Dutton's compensation. Section25-5-57(a)(3)g. of the Act provides for the compensation of unenumerated injuries, like those suffered by Dutton, which result in permanent partial disability. That section provides for the compensation of such employees as follows:
 "[C]ompensation shall be 66 2/3 percent of the difference between the average weekly earnings of the workman at the time of the injury and the average weekly earnings he is able to earn in his partially disabled condition, subject to the same maximum weekly compensation as stated in section 25-5-68 [$220]."
Judge James O. Haley restates the statutory formula for each separate permanent partial disability when the injury is to the body as a whole as follows:
 "Multiply the percentage of disability for loss of earning capacity by the average weekly earnings [prior to the injury]. That produces the employee's loss of earning capacity. You then multiply that figure by sixty-six and two-thirds percent and that gives you the amount of money payable to that employee per week. . . . [Compensation] is payable for a period of 300 weeks less the number of weeks previously paid either as permanent partial or as temporary total benefits."
". . . .
 "It will be noted that this section provides that the maximum weekly compensation [$220] as stated in § 25-5-68 is applicable. . . ."
J. Haley, Handbook of Alabama's Workmen's Compensation Law, pp. 88-89 (1982).
The trial court's judgment reflects that the statutory formula (average weekly wage x % of loss of earning capacity x 66 2/3%) was not properly applied in determining the amount of Dutton's weekly benefits. See USX Corp. v. Mabry, 607 So.2d 249
(Ala.Civ.App. 1992). The trial court's judgment regarding the award of benefits is due to be reversed.
 SAGINAW'S ISSUES
We now address the evidentiary issues raised by Saginaw in its cross appeal. First, Saginaw contends that the trial court erred in allowing Dutton to introduce portions of the deposition of Michael Staff, Dutton's vocational expert, which contained opinion testimony as to Dutton's vocational impairment based in part on information gathered *Page 600 
from Dutton before he reached maximum medical improvement. In his deposition, Staff stated that he based his vocational impairment evaluation of November 20, 1992, in part on an evaluation he had made on April 6, 1988, before Dutton reached maximum medical improvement.
We find that the trial court did not err in allowing Staffs opinion testimony into evidence. Although a claimant of worker's compensation benefits may not recover permanent partial or permanent total disability benefits until the claimant reaches maximum medical improvement, Edward WigginsLogging Co. v. Wiggins, 603 So.2d 1094 (Ala.Civ.App. 1992), there is nothing to prohibit a vocational expert fromtestifying as to the claimant's vocational disability percentage before that time. See Acustar, Inc. v. Staples,598 So.2d 943 (Ala.Civ.App. 1992).
Next, Saginaw contends that the trial court erred in allowing into evidence both portions of Staff's deposition containing opinion testimony concerning Dutton's vocational disability and Staff's written reports. Saginaw asserts that Staffs opinion testimony and his reports should not have been allowed into evidence because some of the sources on which Staff based his opinion and reports had not been entered into evidence. In forming his 1988 and 1992 opinions as to Dutton's vocational disability, Staff relied in part on (1) the medical report of Dr. Steven Nichols, who performed surgery on Dutton's right shoulder; (2) a physical capacities evaluation generated by Health South Hospital; and (3) a computer program known as the "Quest Program." None of these three sources was admitted into evidence. However, Staff stated in his deposition that he also relied on two interviews he personally conducted with Dutton, each lasting approximately one hour.
"Expert witnesses may, at the discretion of the trial judge, be allowed to testify based in part on hearsay." E SFacilities, Inc. v. Precision Chipper Corp., 565 So.2d 54, 63
(Ala. 1990). Thus, it was within the trial court's discretion to allow into evidence both the opinion testimony contained in Staff's deposition and his report, which reflected that opinion.
Finally, Saginaw contends that the trial court erred in allowing Dutton to enter into evidence portions of Staffs deposition containing opinion testimony based in part on the results of the Quest Program because Staff did not testify that the program was authoritative, trustworthy, and reliable. At trial, the following excerpt from Staffs deposition was read into the record:
 "Q. You also testified earlier that part of this report was computer generated. Does the computer actually prepare the report or does it merely crunch the numbers, so to speak, that you once had to do by hand?
 "A. It gives us data that we once used to have to figure by hand. Since we do such a volume of these things, we had to go to the computer to help us.
"Q. Okay.
"A. It also reduces the costs.
 "Q. Okay. So this is something that reduces the time involved in preparing the reports —
"A. That is correct.
 "Q. — due to now this is able to be done automatically as opposed to manually?
"A. That is correct."
Because the computer program merely performs mathematical calculations based on figures placed into it by the expert himself, Staff was not required to testify as to the program's reliability any more than he would have had to testify as to the reliability of a calculator or his own manual calculations if he had used those instead of the program. If incorrect, mathematical calculations may be attacked on cross-examination; an expert need not testify as to their reliability. Moreover, as the trial court pointed out, the mere fact that Staff used the computer's calculations indicates that he believed its results to be reliable. Thus, we find no error in allowing Staff to give an opinion based in part on the computer program.
Based on the foregoing, we find that the trial court did not err as to the evidentiary issues raised by Saginaw on appeal, and we affirm the trial court's judgment as to those issues. We hold, however, that the trial court failed to correctly apply § 25-5-57(a)(4)h. *Page 601 
as to separate successive injuries and § 25-5-57(a)(3)g. in calculating the weekly benefits, and we reverse that part of the trial court's judgment.
The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, J., concurs.
THIGPEN, J., concurs in the result.